MECHANICS' BANK *versus* ABNER R. HALLOWELL *& al.*

In an action by the indorsee against the makers of a negotiable promissory note given by the defendants to B. D. P.,—who was State Treasurer, — and, after being indorsed by him, was presented to the plaintiffs' bank, with which said B. D. P., as said treasurer, had an account, for discount; and discount was refused until indorsed by B. D. P. as " State.Treasurer," whereupon that indorsement was added, the note discounted and its proceeds, by his direction, placed to the credit of his said account, thereby making a balance in favor of the State of more than $1100; and the plaintiffs, about the time the note became due, learning that B. D. P. was a defaulter to the State, received from him a check for $1100, signed by B. D. P., " State Treasurer," and the amount indorsed on said note; and the plaintiffs thereafterward paid the said amount of $1100 to the State, and erased the indorsement of said amount from said note; — *Held,* —

1. That the proceeds of said note, thus passed to the credit of the State, are to be regarded as its funds;

2. That the attempted payment of the $1100 to the plaintiffs, was against the statute, and did not constitute a payment *pro tanto* of the note;

3. That, if the transaction were fraudulent on the part of B. D. P. and the

bank, it was so as against the State alone, and not as against the defendants, whether principals or sureties;

4. That the plaintiffs lost no rights by voluntarily paying over the amount indorsed to the State; and

5. That the defendants must be deemed as principals to the bank, having no defence in law or equity.

Essentials of a payment.

ON FACTS AGREED.

ASSUMPSIT.

The note declared on was as follows:—

"Bangor, August 24, 1859.

"For value received, we jointly and severally promise to pay B. D. Peck, or order, two thousand dollars, in four months, at Suffolk Bank, Boston.    "A. R. Hallowell,
"$2000.                                "Geo. R. Smith."

"P. N. P. Dec. 27th, 1859.

"5912.          "B. B. N. P. fee and postage, $2,03."

Indorsed by "B. D. Peck, and B. D. Peck, S. Tr."

The note was in fact given for accommodation of B. D. Peck, of which the plaintiffs were not conusant.    It was discounted by the plaintiffs, Sept. 24, 1859, at the request of Peck, who was Treasurer of the State of Maine, until January, 1860, and had, at the plaintiffs' bank, during most of the time he was Treasurer, an account, made up of cash and checks purporting to be official, and of the discount of notes of said Peck, signed by him and others.

The account on the plaintiffs' books was headed as follows:

"Dr.    B. D. Peck, State Treasurer, in account with Mechanics' Bank.    Cr."

The note in suit amounting, less the discount, to $1,969,00, was passed directly to the credit of this account, and is the last credit, excepting two deposits of cash, amounting together to $625,00, made a few days after.

When said note was first offered for discount it was indorsed "B. D. Peck" only.    Discount was refused unless also indorsed by said Peck as State Treasurer, and that indorsement was thereupon added.    Peck was not authorized

by any legislation of the State to indorse or negotiate said note as State Treasurer or in behalf of the State on its credit.

When said note fell due, namely, Dec. 28, 1859, not being paid, it was protested. About this time, it was ascertained that Peck was a defaulter to the State. Dec. 29, Dow, one of Peck's bondsmen to the State, called on the president of the bank and requested him, as Peck was in trouble, not to honor any more of Peck's checks against said account. In the evening of the same day of this interview with Dow, said president, with the cashier, called on Peck with the note and urged payment. There was then a balance to said account of $1,168,70. Peck gave them a check against said account, signed "B. D. Peck, State Treasurer," for eleven hundred dollars, which was duly cancelled at the bank, as is usual with checks when paid, and the amount indorsed as a partial payment on said note in suit.

The $1,100,00 was at once passed on the bank's books to the debit of said account, and has ever so remained.

The said B. D. Peck, during the year 1859, was in the habit of using the money of the State in his own private business, and, to replace in whole or in part the money thus used, was in the habit of obtaining discounts of notes of individuals, sometimes indorsed by himself as Treasurer, and sometimes not so indorsed. At the time of the discount of the note in suit, the said Peck was largely a defaulter to the State, and has ever since remained a defaulter. But the plaintiffs had no knowledge until a long time after the discount of this note, that said Peck was a defaulter, or that he was using the money of the State in his own private business.

The following joint order was passed by the Senate and House of Representatives : —

"STATE OF MAINE.

"In Senate, March 10, 1860.

"Ordered, — That the Treasurer of State be directed to demand of the Mechanics' Bank, Portland, the sum of eleven hundred dollars, being the amount of the money of the State

paid to said bank, on the twenty-ninth of December, A. D. 1859, by B. D. Peck, late State Treasurer, without authority of law; and the payment thereof to be made on or before Wednesday next."

In compliance therewith, the bank subsequently paid the State the sum of eleven hundred dollars, but without defendants' consent; and also, without their consent, the indorsement of partial payment of said sum on the note was erased by said *Peck at plaintiffs' suggestion."*

It was agreed that the said cause shall be submitted to the Law Court on the above statement of facts, the Court to order such judgment as the law and facts require.

*Evans & Putnam,* for the defendants.

*Allen Haynes,* for the plaintiffs.

The controversy in this case is solely about the $1100. The defendants admit the balance of the note to be due and unpaid. But the plaintiffs claim the whole amount of the note and are entitled to recover it, unless the $1100 transaction operated as a payment of so much.

It will not be claimed that Peck had any authority to bind the State by his indorsement of this note as State Treasurer. That indorsement added nothing legally to the note. Although this did not occur to the plaintiffs, at the time of the indorsement and discount, as a matter of law, they will be held to have known it. This fact of the indorsement by Peck, as State Treasurer, may therefore be laid out of the case.

The next point to be considered is, that all moneys which went into Peck's hands as State Treasurer, were and remained the property of the State, and did not become the private property or moneys of Peck. And money deposited in bank to the credit of Peck, as State Treasurer, was the money of the State. The statutes recognize this principle. R. S., c. 2, § 28.

"The Treasurer shall not in any way receive for his own

use any interest, &c., by reason of any money belonging to the State," &c.

"No greater amount of money of the State than twenty thousand dollars shall be deposited in a bank," &c. R. S., c. 2, § 30.

The Treasurer is required to make an exhibit showing the banks or places in which such moneys of the State are kept and deposited, the amount, &c. R. S., c. 2, § 31.

The Treasurer shall not loan, use in his own business, or for his own benefit, any such money, or permit any other person to do so. R. S., c. 2, § 28.

The statute thus makes it his duty to treat this money not as his own; but as that of the State, and to keep it separate and distinct from his own. In fact, B. D. Peck, State Treasurer, and B. D. Peck, in his private capacity, are, in contemplation of law, two distinct persons. Their accounts at the bank should be as distinct as the accounts of the Treasurer, as such, and the accounts of any other man. Money in bank to the credit of B. D. Peck, State Treasurer, is money of the State, to its own credit, and money in bank to the credit of B. D. Peck, is money to his individual credit. The latter has legally no more connection with the former than it has with the account of any other citizen of the State.

Keeping this distinctly in view, there is no difficulty in the case.

In 1859, Peck had used money of the State to a large amount. To repay the State, he was in the habit of obtaining discounts of notes of individuals. When the note in suit was discounted, he was a defaulter, and the inference is reasonable that he had this note discounted for the purpose of replacing, in part, his deficit. These defendants lent their note to Peck for that purpose—or, at any rate, to raise money upon, and no agreement is suggested that the proceeds were to be applied to any other purpose. When the note was discounted the proceeds were the property of Peck. He had them passed to the credit of the State Treas-

urer. This was so much payment towards his deficit to the State; and the moment this money was thus credited on the books of the bank, it became the property of the State, and all the incidents of money of the State attached to it.

It will not be pretended that, if things had remained in this condition, the defendants could have any defence to this note, or had any claim on the State, or on the plaintiffs, for the avails of it, which had been passed to the credit of the State. It was as much the property of the State as any other money in the treasury.

After it became known that Peck was a defaulter, $1100 of this money was checked out by Peck and indorsed upon this note. The State reclaimed this $1100 and the plaintiffs paid it.

Could the plaintiffs have withheld this money from the State? It needs no argument to show that, if a man receives from one party money belonging to another, he may be compelled to repay it in an action for money had and received. Greenl. Ev., §§ 117, 119, 120, 121, and authorities there cited.

It follows, then, as a matter of course, that the plaintiffs could not hold this money as against the State. And, as the State did demand and receive this $1100 of the plaintiffs, there has been no payment on the note and the defendants can take no advantage of the indorsement.

The opinion of a majority of the Court was drawn by

Appleton, C. J.—The note in suit is payable to B. D., Peck or order, and by him indorsed. The fact that, after his individual indorsement, is to be found on the note an indorsement by him, as Treasurer, in no way affects the right of the plaintiffs to recover. The bank may have failed to obtain the security of the State by such indorsement, but that affords no defence to the makers of the note, or prevents the title thereto vesting in the plaintiffs.

"The moneys of the State" are entrusted to its Treasurer for safe keeping, but, though he misapply them, they none

the less belong to the State. It is a misapplication of the funds of the State by him, not an appropriation of his own.

By R. S., 1857, c. 2, § 26, the Treasurer is required to give bond to the State.

By § 27, "the condition of the bond shall be for the faithful discharge of all the duties of his office, the fidelity of all persons by him intrusted with any of the concerns thereof, and that during his continuance in office he will not engage in trade or commerce, or as a broker, agent or factor for any merchant or trader," &c.

By § 28, "the Treasurer shall not in any way receive for *his own use* any interest, gratuity or benefit by reason of any money *belonging to the State*, or of any loan obtained for the State, &c. He shall not loan, use in his own business or for his own benefit any such money, or permit any other person to do it, unless authorized by law, upon pain of forfeiting a sum equal to the amount so used or loaned, to be recovered by indictment."

By § 30, "no greater amount of '*the money of the State*' than twenty thousand dollars shall be on deposit in a bank unless it is necessary for the payment of bonds of the State and interest, becoming payable at such bank."

By § 31, the Treasurer is required to make monthly exhibits, showing the places or banks in which "the moneys of the State" have been kept and deposited during the past month, &c.

It is apparent from these provisions that "the moneys of the State" intrusted to its Treasurer, while under his care and supervision, ever remain its moneys. The bond required is not so much for "the moneys" as for the faithful discharge of his duties in reference thereto. For the one it would be entirely inadequate, while for the other it might be amply sufficient.

The statute authorized Peck, as State Treasurer, to make a deposit with the plaintiff bank. His deposit with the bank, the case finds, was made of "cash and checks purporting to be official," and of the discount of notes signed by

Peck and other individuals. It was headed thus, — "Dr. B. D. Peck, State Treasurer, in account with Mechanics' Bank. Cr."

The moneys thus deposited and passed to the credit of the State Treasurer belong to the State, and are a part of its funds or they are not. If they are not the funds of the State, they would, on his death, descend to the heirs of the Treasurer, if solvent. If insolvent, they would be divided among his various creditors, of whom the State would be one, and would be thus entitled to a fractional share, greater or lesser, according to the insolvency of the estate. If not the moneys of the State, the funds in the different banks might have been trusteed as the funds of Peck in suits against him, — a view of the law which might have been gratifying to his creditors. But such is not the law. The consequences would be too monstrous to allow one for a moment to assent to such a proposition. Moneys of the State thus deposited remain its property and cannot rightfully be appropriated save to its use.

But it is urged that the proceeds of notes discounted for Peck, and passed by his direction to the credit of the State, are not to be regarded as its funds. But such is not the law. Peck was a defaulter. The money belonging to him and arising from notes discounted at his request was by his order passed to the credit of the State. It remains to its credit. No mistake is pretended. He is estopped to deny that the funds thus credited belong to the State. They should remain there until withdrawn in the due course of business, or until the final adjustment of his account. The bank has received these funds as the money of the State, and is bound by such reception so to recognize it. They have been understandingly appropriated to the credit of the State. They are mingled with its other moneys. Who is authorized without the consent of the State to separate and withdraw it? The State forbids it. Is this Court to sanction and approve the robbery of its treasury?

Nor is the conclusion different if the discounts obtained

by Peck and passed to the credit of the State are to be regarded merely as *prima facie* its money. This presumption is not rebutted, but the reverse. Peck was a defaulter. He procured the loan to enable him, by replacing thus far the amount misappropriated, to conceal, if possible, his defalcations. The money loaned was his. He directed it to be credited to the State. If Peck ordered this appropriation of his funds and the bank assented thereto, it cannot be changed against and contrary to the will of the State. The funds in controversy belong then to the State.

The payment to the plaintiff with the funds of the State was illegal and against the express commands of the statute. As the bank received them with a full knowledge of all the facts, the State might have maintained an action to recover back the money thus wrongfully and fraudulently misapplied in payment of the individual indebtedness of its Treasurer. Such being the law, the bank lost no rights by voluntarily doing what, by law, it would have been compelled to do. *Scranton, Ex.*, v. *Bank of Rochester*, 24 N. Y., 424.

As against Peck, whether the note was for his accommodation or not, the bank is entitled to recover the full amount. The payment became unavoidable to the bank, as the State recalled the money thus illegally paid. The bank has received no benefit therefrom. The indorsement on the note in suit, of the amount of the check given by Peck, was erased by him. It cannot be doubted that the claim of the bank against them remains unaffected by what has been done. No part of his indebtedness has been discharged.

The proof shows that the officers of the bank had no knowledge that the note in suit was given for the accommodation of Peck. They might well regard the defendants as principals. Indeed, as to the bank, they must be deemed principals, and as having no defence in law or in equity. No payment has been made by them, or for, and on their account, which has enured to the advantage of the plaintiffs. Their indebtedness is not to be discharged because the indorser of the note, in which they are principals, attempted

with other people's money to make a payment, which he had no right to make and which the payee could not legally retain, and, being unable to retain, surrendered to the lawful owner. These facts would not establish the plea of payment in whole or in part. If all the facts, upon which the defendants rely, were duly pleaded, they would constitute no bar to the maintenance of this action, to the whole extent claimed by the plaintiffs.

If there had been no indorsement upon the note in suit of the money of the State, wrongfully paid by Peck and received by the bank, there would hardly have been the pretence of a defence. But an indorsement is at best but evidence of payment and is open to explanation. It is not conclusive. The evidence entirely negatives any presumption of a valid payment.

As Peck could not defend against the note, so neither could these defendants, if they were to be regarded as his sureties. The alleged payment was an illegal one on the part of Peck. If the transaction was fraudulent on his part and on that of the bank, it was so as against the State alone and not as against these defendants, whether they be principals or sureties. It was for their benefit that the State should not intervene. If the State should interfere, they would lose nothing which belonged to them. Assuredly, they had no claim to the money of the State. If the bank had surrendered security, or in any way injuriously affected their condition, the case would be different. The bank could not do otherwise than it did. It simply paid over to the true owner, what did not belong to it.

The wrong attempted, was the injury *of the State.* But these defendants cannot invoke, by way of defence, a fraud on third parties, which did not in the slightest degree injure them, but which, if consummated, would have been beneficial to them to the extent of its consummation. The bank has received nothing the law authorizes it to retain. Peck has made no valid payment. These defendants have paid nothing. The attempt of Peck to pay with the money of

the State proved unsuccessful. If Peck and the officers of the bank attempted to misapply the funds of the State to the payment of the note in suit, and to the consequent benefit of these defendants, if the State should not interfere, they are not to be released from any legal liability, by reason of the failure of such attempt, unless their condition has thereby been made worse. This is neither alleged nor proved.

It is essential to a payment, that the title to the money or other property transferred for that purpose, pass to and vest in the creditor without the right of reclamation by the owner, if other than the person making such payment. "When the obligation is to give anything, the payment consists in an *absolute transfer* of the property. It follows, that it is essential to the validity of a payment, that it be made by a person who is able to make such transfer. Whence it also follows that the payment cannot be valid unless made by the *proprietor of the thing*, or with his consent; for otherwise, the person who makes the payment cannot transfer the property to his creditor; *Nemo plus juris in alium transferre potest quam ipse habet.*" 1 Evans' Pothier, p. 3, c. 1, art. 1.

Though a payment, where no title to the thing passes to the creditor, would not be valid, it seems the creditor, while retaining possession, cannot claim any other payment; he must suffer an eviction, or offer to restore what he has received to the debtor. 1 Evans' Pothier, p. 3, c. 1, art. 1.

When the payment is with the money of a third person, and the creditor receives the same in good faith, and there is no right of reclamation, such payment would be valid. But, if the circumstances are such that the creditor cannot legally retain the money and, upon demand, he restores it to the owner, the debt cannot be regarded as paid. The person making the payment should in all cases be able to transfer a good title to that with which he makes his payment, whether it be money or specific articles.

Whether the defendants are principals, as the bank insists they are, or sureties, as they claim to be, the result is

the same.  In neither event can they set that up as a payment, which, being made with the money of the State and without right, the payor had no right to make nor the payee, knowing all the facts, to retain, and which was not retained. They have sustained no loss.  They have no right to insist upon a misapplication of the funds of the State, whether the result of fraud, of ignorance of the law, or of mistake, however much it might relieve them.  Their debt remains unpaid.  Their liability continues unchanged.

> *Defendants defaulted for the whole*
> *amount of the note in suit.*

KENT, WALTON, DICKERSON and DANFORTH, JJ., concurred.

CUTTING, J., dissenting.—On August 24, 1859, *B. D. Peck*, then Treasurer of the State, having in his individual and official capacity opened an account with the plaintiffs, in which his private and public funds were credited to him as Treasurer, procured the accommodation note now in suit and transferred the same to the bank by whom the proceeds were thus credited.

The note was made payable to *Peck* or his order, and indorsed by him, both in his individual and official capacity, the latter, although at the request of the plaintiffs, was without official authority.

When the note became payable it was duly protested for non-payment; at which time the Treasurer had a credit in the bank over and above his liabilities of $1168,70, and, at the special instance and request of the bank, drew his official check for $1100, which was received, charged to him and indorsed on the note.  Prior to this time, however, the bank had become aware of Peck's official defalcation, and, with full knowledge of that fact, obtained the check in part payment of the note and made the indorsement thereon.

Subsequently, the Legislature, who had granted, and still retained the power to nullify the charter of the bank,—

" *Ordered,*—That the Treasurer of the State be directed

to demand of the Mechanics' Bank, Portland, the sum of eleven hundred dollars, being the amount of the money of the State paid to said bank, on the twenty-ninth of December, A. D. 1859, by *B. D. Peck*, late State Treasurer, without authority of law; and the payment thereof to be made on or before Wednesday next."

On that day the demand was made, to wit, on March 10, 1860, and the amount claimed was paid to the then State Treasurer by the bank, who, without the knowledge or consent of the defendants, erased their previous indorsement, and in this suit claim to recover the note with the indorsement thus erased.

Whether, or not, the Legislature acted wisely in their peremptory demand, or the bank in its ready compliance, we are not now called upon judicially to determine. It has, however, been suggested that the resolve was *in terrorem.* But, *Tantaene animis coelestibus irae!*

It may be very questionable whether that part of the resolve, which embraces an *ex parte* adjudication, that the payment was made "without authority of law" is correct. It has been otherwise decided in New York, in the case of *Swartwout* v. *Mechanics' Bank*, 5 Denio, 555, where the Court held that "a mere deposit by a collector in his own name, with his official addition, is no accounting for the money received by him in his official capacity. A county treasurer, sheriff, surrogate, or other officer, opens an account with a bank with his addition, and keeps a separate account in such capacity; most clearly he can collect such deposit in his own name, and the bank would not be permitted to show that the money belonged to the county."

But in the same State, in a subsequent decision, in the case of *Scranton, Ex'r,* v. *The Farmers' and Mechanics' Bank of Rochester*, 10 Smith, 424, a contrary opinion was pronounced by a majority of the Court, (two members thereof dissenting.) In that case it was held that an insolvent executor by depositing funds derived *exclusively from the proceeds of his testator's estate*, in his official capacity, thereby

transferred them to the testato'rs heirs, and beyond the reach of his own private creditors. The law, therefore, upon this point, seems to be unsettled. It may, perhaps, be contended with a degree of plausibility, that the Court, in the first, and the dissenting Judges in the second opinion, advanced the sounder reason and the better logic. In the case at bar, however, the funds deposited never belonged to the State.

Our statute, c. 2, § 30, provides that, — "No greater amount of money of the State than twenty thousand dollars shall be on deposit in any bank, unless it is necessary for the purpose of paying bonds of the State and interest, becoming payable at such bank." It is, therefore, urged that money so deposited is *ipso facto* a transfer to the State. But, under that section, the Treasurer is not obliged to deposit in any particular place. He may keep the money in his actual possession. What safety to the State would it be against a fraudulent Treasurer to have the money so deposited? His official checks would soon restore it to himself or disseminate it in various ways. But money so deposited may be an excuse for the Treasurer in case of the subsequent insolvency of the bank. Practically, that section can produce no other result. The security of the State, then, is principally the official bond, the moral worth and integrity of the incumbent, stimulated to duty by the executive officers, and the threatenings contained in § 28.

But, whether the foregoing views be correct or otherwise, it may not be very material in this case. I base my opinion principally upon other and distinct grounds. There may be instances when the depositor, acting in *bad* faith, may suffer the funds to be misappropriated, for which he may become accountable to the true owner. There is another class of cases where it is said, "that ignorance of the law, with the full knowledge of the facts, furnishes no ground to rescind agreements, or to set aside solemn acts of the parties." *Jones* v. *Mathews*, 31 Maine, 318, and authorities there cited. Had the plaintiffs, under the former, become ac-

countable to the State; still, under the latter contingency, they may be wholly without remedy.

At the time of the disclosure of *Peck's* insolvency three parties were interested in the legal appropriation of his bank assets; viz., his sureties on his official bond, the bank and the signers of accommodation paper. It was known to the bank that the note in suit was payable to *Peck* in his individual capacity, but was discounted solely on the strength of his official indorsement, and so credited to him in his account current, at a time when the balance was largely in his favor. The attorney for the bank now admits that the official indorsement was without authority, or, in other words, that it was perfected by parties ignorant of the law, which ignorance caused the negotiation that otherwise would not have been accomplished. Thus far there was no ignorance of any material *facts*. How was it in relation to subsequent proceedings? This is disclosed in an extract from the agreed statement. "When said note fell due, namely, Dec. 28, 1859, not being paid, it was protested. About this time it was ascertained that Peck was a defaulter to the State. Dec. 29, Dow, one of Peck's bondsmen to the State, called on the president of the bank and requested him, as Peck was in trouble, not to honor any more of Peck's checks against said account. In the evening of the same day with this interview with Dow, said president, with the cashier, called on Peck with the note and urged payment. There was then a balance to said account of $1,168,70. Peck gave them a check against said account, signed B. D. Peck, State Treasurer, for eleven hundred dollars, which was duly cancelled at the bank, as is usual with checks when paid, and the amount indorsed as a partial payment on said note in suit."

That indorsement, by well settled rules of law, cannot be cancelled except on proof of an ignorance of *facts*. None such is pretended, but, on the contrary, it was made with full knowledge of the antecedent and subsequent history of the note and of Peck's individual and official relations.

The plaintiffs may recover the amount for which the defendants offered to be defaulted and costs up to that time, and the defendants their costs since the offer.